# Constitutionality of Health Care Reform

The proposed Health Security Act is well within the authority of Congress under the Commerce
   Clause, and it does not violate Tenth Amendment or other principles of federalism.

The proposal contains no unconstitutional takings of private property or infringement of liberty interests.

The proposed delegation of administrative authority to the National Health Board, and, from it, to state
   alliances, is not an impermissible delegation of legislative authority

October 29, 1993

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL
AND THE ASSOCIATE ATTORNEY GENERAL

The Health Security Act ("Act") creates for all citizens the security that health
care coverage will always be available to them. It accomplishes this by building on
the existing American system for providing health care, which largely operates
through employers. Much of the system will be administered by the states, which
will have primary responsibility to ensure that regional health alliances are estab-
lished, to certify accountable health plans, and to provide mechanisms to resolve
complaints and disputes.

This legislation is well within the long-recognized authority of the federal gov-
ernment. It is fair to say that, just as the substantive contents of the legislation
draw on existing models and approaches to health care delivery and financing, the
structure, processes and mechanisms the legislation uses to accomplish its substan-
tive objectives draw on already existing and validated techniques that the national
government has employed on numerous other occasions.

Notwithstanding the well-established legitimacy of the means that the Act em-
ploys to achieve a public purpose of paramount importance, some special interests
have such financial stake in the current system that they have strong incentives to
challenge the Act even on highly implausible grounds, if the consequences of do-
ing so were to alter the ultimate design of the system even slightly in their favor.

Congressman Richard Gephardt has described the Act as the most historic piece
of social legislation since the Social Security Act of 1935, and in a curious way the
challenges to the constitutionality of the Health Security Act's basic structure re-
play arguments levelled at the Social Security Act and other New Deal legislation
enacted over fifty years ago. These arguments were considered and dismissed
then, they remain unsound to this day, and they should not be allowed in any way
to deflect consideration of the merits of the President's proposal — nor could they

124

succeed against that proposal without threatening to unravel numerous vital statutes enacted since the 1930's.

- **The National Government Possesses the Constitutional Authority to Undertake National Health Care Reform.**

The most fundamental constitutional challenge to national health care reform is that it lies beyond the power of Congress and the President to enact. Fortunately, the Supreme Court has long since rejected the crabbed view of national legislative authority that necessarily lies behind such a challenge.

During the mid-1930's, when for a brief time the Court invalidated some aspects of the New Deal, a majority of the Justices accepted the argument that Congress lacks the power "to protect the general public interest and the health and comfort of the people."[1] That argument was predicated on an exceedingly narrow conception of the authority of the federal government to address problems of national dimension under the commerce clause of the Constitution. The Court quickly abandoned that attack on the New Deal as inconsistent with the text and structure of the Constitution and, indeed, with the Court's own precedents.[2] Noting that "there has long been recognition of the authority of Congress to obtain . . . social, health or economic advantages from the exercise of constitutional powers,"[3] the Court concluded that Congress's authority over "commerce among the several States" empowers the national government to address all activity, "whatever its nature . . . if it exerts a substantial economic effect on interstate commerce."[4] Upholding Congress's power to regulate the sale and distribution of coal because of the impact of that industry on American economic and social life, the Court stated:

> If the strategic character of this industry in our economy and the chaotic conditions which have prevailed in it do not justify legislation, it is difficult to imagine what would. To invalidate this Act we would have to deny the existence of power on the part of Congress under the commerce clause to deal directly and specifically with those forces which in its judgment should not be permitted to dislo-

---

[1] *Carter v. Carter Coal Co.*, 298 U S 238, 290 (1936). Justice Cardozo, joined by Justices Brandeis and Stone, dissented from the majority's denial to Congress of the power to deal with a problem — unrestrained competition in the coal industry — that "choked and burdened" commerce and had produced "bankruptcy and waste and ruin." *Id* at 331 (Cardozo, J , dissenting). Five years later, the Supreme Court explicitly endorsed Justice Cardozo's understanding of congressional power with only one Justice in dissent *See Sunshine Anthracite Coal Co v Adkins*, 310 U S 381, 395 (1940) The following Term, a unanimous Court dismissed the views of the *Carter Coal* majority as inconsistent with sound constitutional principle *United States v. Darby*, 312 U S. 100, 123 (1941)

[2] The Court's flirtation with a limited view of national power was brief indeed. *Carter Coal* was decided on May 18, 1936. and effectively repudiated by a trilogy of cases decided on April 12. 1937 *See, e g., NLRB v Jones & Laughlin Steel Corp*, 301 U S. 1 (1937)

[3] *Cloverleaf Butter Co v Patterson*, 315 U S 148, 163 (1942)

[4] *Wickard v Filburn*, 317 U S. 111, 125 (1942)

cate an important segment of our economy and to disrupt and bur-
den interstate channels of trade. . . . Congress under the commerce
clause is not impotent to deal with what it may consider to be dire
consequences of laissez-faire.[5]

The American health care industry is one of the largest and fastest growing
segments of the American economy, and it has the most direct and crucial impact
on the lives of all Americans. Spiralling health care costs and inequities in the
provision of health care services have an immediate and massive effect on the na-
tional economy and thus upon interstate commerce. As a result Congress unques-
tionably possesses the power "to deal directly and specifically" with health care in
order to obtain "social, health [and] economic advantages" for the American peo-
ple.

### • National Health Care Reform Preserves our Federal System.

The President's health care reform plan will invite state participation in the for-
mulation and administration of national health policy; if an individual state gov-
ernment should choose not to participate, the federal government will administer
the health care system in that state. This type of cooperative federal-state program
is now quite common in federal legislation. Examples range from many of the
major modern environmental laws, including the Clean Air Act, the Clean Water
Act, and the Resource Conservation and Recovery Act, to much older legislation,
such as Title IX of the Social Security Act, establishing a system for unemploy-
ment compensation. Challenges to such legislation based on constitutional princi-
ples of federalism were made during the New Deal, when it was alleged that the
national reform legislation of that era stripped the states of powers that were re-
served to them by the Tenth Amendment. But that argument was wholly without
merit then, and it remains wholly without merit today.

In rejecting the notion that principles of federalism somehow rendered the old
age benefits of the Social Security Act of 1935 invalid under the Tenth Amend-
ment, the Supreme Court admonished that "nation-wide calamit[ies] . . . may be
checked, if Congress so determines, by the resources of the Nation [in order] to
save men and women from the rigors of the poor house as well as from the haunt-
ing fear that such a lot awaits them when journey's end is near."[6] More funda-
mentally, that same day, the Court also rejected a Tenth Amendment challenge to
elements of the Social Security Act that created a cooperative plan whereby states
were free to provide unemployment compensation and thereby trigger benefits un-
der the Act for employers in the state. In so doing, the Court issued a resounding
declaration that Congress may enact legislation that addresses a "problem . . . na-

---

[5] *Sunshine Anthracite Coal Co. v Adkins,* 310 U.S. at 395-96
[6] *Helvering v. Davis,* 301 U.S. 619, 641 (1937)

tional in area and dimensions" by providing the states with the option to share in the solution or not, at the choice of the individual state.[7] The Court did not accept the claim that a state is "coerced" by Congress when, pursuant to federal legislation the state "cho[oses] to have relief administered under laws of her own making, by agents of her own selection, instead of under federal laws, administered by federal officers."[8] The Court described such legislation as "the creation of a larger freedom, the states and the nation joining in a cooperative endeavor to avert a common evil."[9] Similarly, under the President's health care proposals, states will have the option to formulate specific plans for implementing the federally guaranteed package of benefits and to oversee the provision and quality of care to their residents as a means of addressing our "common" health care crisis.

- **Health Care Reform will Respect the Constitutional Rights of Individuals.**

The President's plan will guarantee to all Americans an extensive package of health care benefits while protecting the individual's right to make fundamental choices about health care. The plan will ensure the availability of health care by taking into account the economic needs of providers and freeing them from unnecessary paperwork. At the same time, as the President has stated, an essential principle of national health care reform is the exercise of responsibility by health care providers and consumers.

Reports in the media already suggest that opponents of health care reform are preparing to object to the plan as an intrusion into the Constitution's protections of liberty or as a "taking" of private property.[10] Neither argument can be sustained. Indeed, both arguments were pressed unsuccessfully by those who sought to undermine the New Deal.

Almost sixty years ago, the Supreme Court rejected the claim that New Deal-era regulation of the economic choices individuals or businesses make is unconstitutional. While the Justices acknowledged that "[u]nder our form of government the use of property and the making of contracts are normally matters of private and not of public concern," the Court stated that

> Equally fundamental with the private right is that of the public to regulate it in the common interest. . . . Thus has this court from the early days affirmed that the power to promote the general welfare is inherent in government. . . . [N]o exercise of the legislative prerogative to regulate the conduct of the citizen [can be imagined]

---

[7] *Steward Machine Co. v Davis*, 301 U S 548, 586 (1937)
[8] *Id* at 590.
[9] *Id* at 587.
[10] *See* Edward Felsenthal, *AMA to Fight Limits on Doctors' Fees*, Wall St. J., Sept. 9, 1993.

which will not to some extent abridge his liberty or affect his prop-
erty. But subject only to constitutional restraint the private right
must yield to the public need.[11]

Three years later, the Court explained that the liberty protected by the Constitution "is liberty in a social organization which requires the protection of law against the evils which menace the health, safety, morals and welfare of the people."[12] Health care reform will require responsible participation by providers and consumers alike "in the interests of the community."[13] In doing so the President's plan preserves "'the balance which our Nation, built upon postulates of respect for the liberty of the individual, has struck between that liberty and the demands of organized society.'"[14]

The contention that health care reform would in some manner effect an unconstitutional "taking" of the property of providers rests on a mistaken equation of the Constitution's requirements with the dictates of a particular economic theory.[15] Health care reform undeniably will have an impact on the business decisions and economic interests of providers, and it will require financial contributions and personal accountability on the part of consumers. As such, however, the plan will be an "adjust[ment of] the benefits and burdens of economic life to promote the common good"[16] rather than a taking of private property.[17]

---

[11] *Nebbia v. New York*, 291 U S 502, 523-25 (1934) While the particular question before the Court in *Nebbia* concerned the relationship between individual liberty and the power of a state, the Court expressly stated that within its sphere Congress also possesses the "power to promote the general welfare": "Touching the matters committed to it by the Constitution, the United States possesses the power " *Id* at 524

[12] *West Coast Hotel Co v Parrish*, 300 U S. 379, 391 (1937). As in *Nebbia v New York*, the Justices were addressing the meaning of liberty in the context of a challenge to state legislation but made it clear that their reasoning applied to the Constitution's restraints on the federal government as well.

[13] *West Coast Hotel Co. v Parrish*, 300 U.S. at 391

[14] *Planned Parenthood v Casev*, 505 U.S. 833, 850 (1992) (O'Connor, Kennedy, & Souter, JJ.) (quoting *Poe v. Ullman*, 367 U.S 497, 542 (1961) (Harlan, J., dissenting))

[15] When a majority of the Supreme Court's members appeared to make just such an equation, Justice Holmes pointed out the error in their reasoning in a famous dissent The "constitution is not intended to embody a particular economic theory, whether of paternalism and the organic relation of the citizen to the State or of laissez faire." *Lochner v New York*, 198 U S 45, 75 (1905) The Court came to decide that Justice Holmes was right and the *Lochner* majority wrong many decades ago. *See Ferguson v Skrupa*, 372 U.S. 726, 729-30 (1963) (citing Justice Holmes's dissent and noting that "[t]he doctrine that prevailed in *Lochner* . has long since been discarded").

[16] *Penn Central Transp Co v New York City*, 438 U.S 104, 124 (1978) By requiring responsibility on the part of all, the plan clearly avoids economic impositions "disproportionately concentrated on a few persons" — the hallmark of an unconstitutional taking. *Id*

[17] That health care reform will have differing economic impacts on different persons, while obviously true, does not mean that those impacts will be "takings" within the meaning of the Constitution "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law " *Pennsylvania Coal Co v Mahon*, 260 U S. 393, 413 (1922) *See also United States v. Sperry Corp*, 493 U.S. 52 (1989)

- **The President and Congress May Establish a National Health Board and State Health Alliances to Implement National Health Care Reform.**

The health care reform initiative will set up a National Health Board and corresponding state health alliances to implement the plan pursuant to congressionally prescribed standards. National level administrative agencies are commonplace components of many federal statutes, and are necessary for the sound administration of complicated systems. The devolution of some administrative responsibility to states, which then establish health alliances, is vital to the Act's objective of building to the extent possible on the private sector aspects of our current health care delivery system.

Once more, the Supreme Court's New Deal jurisprudence clearly establishes the legitimacy of such delegations of administrative authority. The creation of administrative bodies to carry out legislative mandates was a touchstone of New Deal reforms. At first, the Court concluded that such schemes constituted impermissible delegations of legislative power.[18] Quickly and firmly, however, the Court moved away from that approach — which was at odds with over a century of the Court's own constitutional interpretations. For example, in sustaining actions taken by an official of the Department of Labor pursuant to the Fair Labor Standards Act against a delegation doctrine challenge, the Court admonished that the Constitution did not "preclude Congress from resorting to the aid of administrative officers or boards as fact-finding agencies whose findings, made in conformity to previously adopted legislative standards or definitions of Congressional policy, have been made prerequisite to the operation of its statutory command."[19] Similarly, in rejecting a delegation doctrine challenge to actions of the Secretary of Agriculture under the Tobacco Inspection Act of 1935, the Court observed that the statute set forth Congress's "policy for the establishment of standards . . . . [T]he provision that the Secretary shall make the necessary investigations to that end and fix the standards according to kind and quality is plainly appropriate and conforms to familiar legislative practice."[20] Relying on a constitutional precedent from the early days of the nation, the Court stated that

> [w]e have always recognized that legislation must often be adapted to conditions involving details with which it is impracticable for the legislature to deal directly . . . . In such cases, "a general provision may be made, and power given to those who are to act under such general provisions to fill up the details."[21]

---

[18] *See Panama Refining Co. v Ryan*, 293 U S 388 (1935), *Schechter Poultry Corp v. United States*, 295 U.S 495 (1935)

[19] *Opp Cotton Mills, Inc. v Administrator*, 312 U S. 126, 144 (1941)

[20] *Currin v. Wallace*, 306 U S. 1, 16-17 (1939).

[21] *Id* at 15 (quoting *Wayman v Southard*, 23 U S (10 Wheat.) 1, 43 (1825))

The health care reform initiative is such a case. Simply put, the establishment of administrative bodies to implement the plan is entirely consistent with our constitutional tradition.

- **Conclusion: The President's Health Care Reform Plan is Legislation Based on Well-Established Constitutional Principles.**

As President Clinton has observed, finding a solution to the problems with our health care system will require a willingness to change, and his reform plan is a comprehensive proposal for far-reaching change in both the public and the private sectors. It is possible that some confusion concerning the constitutional legitimacy of the Health Security Act will arise precisely because it is so comprehensive and detailed, and thus necessarily will affect all the major components of our current health care delivery system. There may indeed be no historical analogue of a single bill that does so many things at once. Its comprehensiveness, however, should not mask the fact that the basic means and mechanisms of the plan rest on long-settled principles of constitutional law, principles that seldom have been challenged since the New Deal and that stem ultimately from the work of the Founders of the Republic. The President's plan, far from being constitutionally questionable, rests on what has rightly been called "the first of the constitutional achievements of the American people . . . the formation of a national government that may lawfully deal with all national needs."[22]

The Nation's debate over how best to deal with the great national need for health care reform should proceed untrammelled by worries over the national government's lawful powers that were laid to rest over half a century ago.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*

H. JEFFERSON POWELL
*Attorney - Advisor*

---

[22] Charles L Black, Jr., *The Humane Imagination* 120 (1986)